IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

LARRY SNYDER AND COMPANY, )
)
    Plaintiff, )
)
v. ) Case No. 07-CV-455-PJC
)
CLARK MILLER d/b/a AMERICAN )
UNDERGROUND UTILITIES, )
)
    Defendant. )

## OPINION AND ORDER

The Court has considered Plaintiff's Motion to Reconsider [Dkt. Nos. 91-92] and hereby **GRANTS** the motion. The Courts finds that aspects of the legal analysis contained in its Opinion and Order of Dec. 30, 2009, [Dkt. No. 89] were flawed; accordingly, Dkt. No. 89 is hereby **VACATED** and the Court issues this Opinion and Order after reconsidering the Motions for Summary Judgment of Plaintiff Larry Snyder and Co. ("Snyder") [Dkt. Nos. 63 & 64] and Defendant Clark Miller d/b/a American Underground Utilities ("Miller"). [Dkt. No. 68].

Upon reconsideration, the Court concludes that its previous decision was correct, albeit based on the analysis offered below. Therefore, the Snyder Summary Judgment Motion is **DENIED** and the Miller Summary Judgment Motion is **GRANTED as set forth herein**.

1

# I.
## *Factual Background*[1]

In July 2005, Snyder entered into a construction contract with the Housing Authority of the Osage Tribe ("HAOT") for construction of the Stoneridge Estates Project, an apartment complex with parking lot and underground utilities.[2] The contract between Snyder and HAOT consisted of two American Institute of Architects ("AIA") standard forms. AIA-A101 is a form agreement between the Owner and Contractor where the basis of payment is a stipulated sum. [Dkt. No. 64, Exh. "D"]. AIA-A201 sets out the general conditions of the construction contract. [Dkt. No. 64, Exh. "E"]. AIA-A101, executed on July 18, 2005, expressly incorporated by reference the general conditions set forth in AIA-A201 which had been executed four days earlier. The contract sum as between HAOT and Snyder was $2,770,330.00.

On Aug. 30, 2005, Snyder entered into a subcontract agreement (the "Subcontract") with Miller whereby Miller was to "complete the site work, erosion control, water distribution, sanitary sewer, storm sewer system and parking lot base rock per plans and specifications." [Dkt. No. 64, Snyder Statement of Facts ("SOF") No. 1 and Exh. "A", ¶ 2(I)]. In particular, Miller was to install in-ground utilities to serve the Stoneridge Estates Project. [Dkt. No. 64, Exh. "A," ¶ 2(I)(17)-(22)]. Miller dug

---

[1] The Factual Background is taken from the parties' undisputed facts and uncontested supporting exhibits.

[2] The contracting parties were Larry Snyder & Company and Stoneridge Estates Associates, L.P. HAOT is the owner of the Stoneridge project and Kaw Valley Engineering ("Kaw") was HAOT's representative overseeing the contract. For consistency, HAOT will be referred to as the contracting party for the construction project.

trenches for placement of the utility lines. The sub-surface was compacted and then covered by an asphalt parking lot. A separate subcontractor performed the asphalt work on the parking lot. Miller was to receive $363,000 for work under its Subcontract. [Dkt. No. 64, Exh. "A," at 1].

Among other things, the Subcontract provided that Miller was:

> Responsible for all bedding and compaction of trenches per contract documents, city requirements and the geotechnical report. This is to include 18" minimum of crushed stone base material placed in 8" lifts in all utility and storm sewer trenches under areas receiving paving per plans. <u>All trenches to be compacted to 95% per contract documents. In the event that settlement or failure should occur under parking lots, sidewalks, curb and gutter, and landscaped areas resulting in damage to other trades work, this subcontractor is responsible to remove the damaged area, acquire proper compaction and replace area at this subcontractor's expense.</u>

[Dkt. No. 64, Exh. "A" at ¶ 2(I)(28) (emphasis added)].

The prime contract between Snyder and HAOT required that Snyder include a so-called "flow-through" clause in every subcontractor agreement:

> Contractor shall include with every Subcontractor agreement the following language: Subcontractor binds itself to Contractor and Owner and is obligated to Contractor and Owner in the same manner and to the same extent that Contractor is bound and obligated to Owner under the Prime Contract. All rights which owner may exercise and enforce against Contractor may be exercised and enforced by Contractor against Subcontractor, in the event of any dispute between the Owner and Contractor. Subcontractor shall be bound by all decisions, directives, interpretations and rulings of the Owner or the Architect, at Owner's option, including Owner's termination or suspension of Contractor.

[Dkt. No. 64, Exh. "D," AIA-A101 §7.6.3].

Accordingly, this language was made an express part of the Subcontract with Miller. [Dkt. No. 64, Exh. "A" at 3].

The prime contract also provided that:

> The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

[Dkt. No. 64, Exh. "E," AIA-A201 §12.2.4].

Miller performed its utility trench work and the asphalt parking lot was completed. After the asphalt was installed, some of the utility trenches settled.[3] [Dkt. No. 64, Snyder SOF No. 3 as admitted in part by Miller]. Miller agreed to perform a repair as initially proposed by Snyder.[4] [Dkt. No. 64, Snyder SOF No. 6]. Snyder made this repair proposal to HAOT and Kaw, but it was rejected. [Dkt. No. 64, Snyder SOG No. 7]. Instead, Kaw and HAOT insisted that the entire parking lot be milled down 1½-inch and a new top layer of asphalt applied. [*Id.*]. Initially, Snyder advised Kaw and HAOT that it felt that milling the entire parking lot was unreasonable.

> Due to the fact that soil compaction and moisture content test (sic) were performed by Standard Testing at the beginning of the project and all but one area was within acceptable limits we feel as though the recommendations to replace the entire parking lot proposed by Kaw Valley is unreasonable.

[Dkt. No. 67, Exh. G].

---

[3] While Miller agrees that settlement occurred, it disputes that its workmanship caused the settlement. [Dkt. No. 68 at 2]. However, the dispute as to causation is immaterial to the Court's ruling herein on interpretation of the Subcontract.

[4] Miller contends that it agreed to this repair request in order to preserve an on-going business relationship with Snyder and not because it believed it was contractually obligated to do the work. [Dkt. No. 68, Response to Snyder's Statement of Facts no. 9]. Again, this distinction is immaterial to the Court's ruling.

4

Nevertheless, when Kaw and HAOT insisted on having the entire parking lot milled and a new asphalt top applied, Snyder acquiesced and demanded that Miller do the more expensive repair. Miller refused and Snyder then hired other subcontractors to perform the work. [Dkt. No. 64, Snyder SOF No. 8].

Snyder now seeks from Miller $285,352.92 – the cost Snyder alleges it incurred in the milling and resurfacing of the parking lot.[5] Snyder's motion asks the Court to grant summary judgment in favor of Snyder on its breach of contract claim against Miller.

Miller contends that the Subcontract does not require the repair work ultimately demanded by Snyder and that Miller offered to perform appropriate repair work under the terms of the Subcontract.[6] Miller asks the Court to grant summary judgment in its favor and hold that under the Subcontract the most that Miller was required to do was to repair areas where settlement occurred, not mill and resurface the entire parking lot.

---

[5] Miller disputes that Snyder was required to perform the repair demanded by Kaw and HAOT and further disputes that Snyder's alleged damages are entirely attributable to repair work demanded as a result of settlement. [Dkt. No. 68, Response to Snyder's SOF No. 9]. These disputed issues are immaterial to the contract interpretation question.

[6] Miller also contends that it fully performed its contractual duties and that settlement was caused by poor performance of the asphalt subcontractor. In support of these and other contentions Miller has submitted the unsworn expert report of Michael J. Berryman. This report does not qualify as an affidavit or otherwise admissible evidence for purpose of Rule 56, and, thus, has been disregarded by the court. *See City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1272, n.4 (N.D.Okla. 2003) (*vacated pursuant to settlement July 16, 2003)*; 11 Moore's Federal Practice ¶ 56.14[1][e][i] (Matthew Bender 3d ed.).

## II.
### *Applicable Legal Principles*

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Windon Third Oil & Gas v. FDIC*, 805 F.2d 342, 345 (10th Cir. 1986). In *Celotex,* the Supreme Court stated:

> [t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322.

A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts sufficient to raise a "genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id*. at 252. Thus, to defeat a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Zenith*, 475 U.S. 574, 585 (1986).

In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250. In its review, the

Court must construe the evidence and inferences therefrom in a light most favorable to the nonmoving party. *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992).

The central issue presented by the pending summary judgment motions is one of contract interpretation. "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention. Where there is no ambiguity in the contract the intention of the parties is to be gathered from it and it alone, and it becomes the duty of the court and not the jury to state its clear meaning." *Preferred Physicians Mutual Management Group, Inc. v. Preferred Physicians Mutual Risk Retention Group, Inc.*, 961 S.W.2d 100, 102 (Mo.App. 1998)(citations omitted). Under Missouri law if the Court concludes that a contract is ambiguous then the question of contract interpretation is an issue of fact to be resolved by the jury.[7] *Teets v. American Family Mut. Ins. Co.*, 272 S.W.3d 455, 461 (Mo.App. 2008).

Thus, whether a contract is ambiguous is a question of law. *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.*, 171 S.W.3d 70, 72 (Mo.App. 2005). The Court must consider the entire contract and the natural and ordinary meaning of the language in determining whether a contract is ambiguous. *Id.* at 72-73. A contract is ambiguous if the language in dispute taken in the context of the entire contract is "reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." *Id.* at 73. An

---

[7] Paragraph 16 of the Subcontract provides: "This Agreement and all issues concerning the performance or breach shall be governed by Missouri law." [Dkt. No. 64, Exh. "A," ¶ 16].

7

ambiguity arises when there is "duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Rodriguez v. General Accident Ins. Co. of America*, 808 S.W.2d 379, 382 (Mo. 1991) (en banc). The ambiguity must appear from the four corners of the contract itself; extrinsic evidence cannot be used to create an ambiguity. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 522 (Mo. App. 2007).

### III.
### *Discussion*

The parties agree on this much: The Subcontract between Snyder and Miller is not ambiguous. However, the legal dispute that is central to this case is highlighted by the fact that each party points to a different contract provision as the basis for its contention that the contract is unambiguous, that the parties' intention is clearly expressed therein, and that judgment should therefore be entered in its favor. Snyder relies on the so-called "flow-through clause" it contends incorporates into Miller's Subcontract all of the obligations of the Prime Contracts between Snyder and HAOT. Thus, Snyder contends that Miller had an absolute obligation under the Subcontract to repair settling of the utility trenches at Stoneridge Estates as demanded by Kaw/HAOT. [Dkt. No. 69 at 2]. Under Snyder's view, when Kaw/HAOT demanded that the entire parking lot be re-milled, and not just settled areas repaired, Miller was obligated to perform this work by operation of the "flow-through clause." Snyder further contends that by refusing to perform the repair demanded by Kaw and HAOT, Miller breached the contract and is liable for the damages Snyder incurred in having the repair work performed by other contractors.

HAOT required that Snyder put the flow-through provision in all subcontracts. *See* AIA-A101 § 7.6.3. [Dkt. No. 64, Exh. "D"] and AIA-A201 §5.3.1. [Dkt. No. 64, Exh. "E"]. The goal of such a provision is to ensure that the owner receives a project that complies with the contract documents. To that end, "the owner insists that the prime contractor obtain a commitment from subcontractors to attain that objective." Jonathan J. Sweet, Sweet on Construction Industry Contracts: Major AIA Documents § 17.05n [2009]. The flow-through clause is a general provision requiring a subcontractor's commitment, to the extent of his work under his subcontract, to comply with the terms of the prime contract.

Snyder particularly cites this language from the Prime contract: "Subcontractor shall be bound by all decisions, directives, interpretations and rulings of the Owner or the Architect, at Owner's option, including Owner's termination or suspension of Contractor." [Dkt. No. 64, Ex. "D," AIA-A101 § 7.6.3]. Snyder contends this language was incorporated into the Subcontract [Dkt. No. 64, Ex. "A," at 3] and makes Miller contractually obligated to follow HAOT's direction to re-mill the parking lot in order to repair any settled area(s).

Miller, on the other hand, contends that the Subcontract sets forth Miller's obligations in the event of settling. Miller says it was not required to grind the entire parking lot surface as HAOT demanded because the Subcontract states that in the event of settling Miller's obligation is "to remove the damaged area, acquire proper compaction and replace area at this subcontractor's expense." [Dkt. No. 64, Exh. "A", ¶

9

2(I)(28)]. Miller contends it offered to perform the remedial work required under the Subcontract and, thus, it is entitled to summary judgment.

The Court's first task is to determine whether the Subcontract is ambiguous – in particular, do the contract clauses cited above create an ambiguity, or can they be read in harmony. This is a question of law for the Court. *Klonski*, 171 S.W.2d at 72. The Court has considered the entire contract and the natural and ordinary language contained therein. *Id.* The Court finds no "duplicity, indistinctiveness, or uncertainty in the meaning of the words used in the Subcontract. *See Rodriguez*, 808 S.W.2d at 382. Both parties contend that the Subcontract is not ambiguous, and the Court agrees.

Since there is no ambiguity in the Subcontract, it is now the Court's duty as a matter of law to determine the parties' intention from the four corners of that document. *Preferred Physicians Mutual Management Group, Inc.*, 961 S.W.2d at 102. In interpreting and reconciling these provisions, the Court has sought to avoid any reading of the provisions that would render one meaningless surplusage. Reviewing the four corners of the Subcontract and the incorporated documents, the Court concludes that the language of Paragraph 2(I)(28) reflects the intention of the parties at the time of the contract as to Miller's obligation in the event of settlement of areas where utility lines were installed. The Court concludes that Snyder and Miller intended that in the event of settlement over the utility trenches Miller would remove the damaged area, properly compact the ground beneath and then replace the damaged area. Snyder's interpretation of the parties' intent would create a clear conflict: Instead of removing the damaged area where settlement occurred, Miller would be required to re-mill a

larger – undamaged area.  Miller would not be removing or repairing a "damaged area", but would be required to replace the entire parking lot.  The language of the Subcontract clearly indicates that Miller is to repair that portion of the area that is damaged, not replace the entire area.[8]

The Subcontract envisioned possible settlement under "parking lots, sidewalks, curb and gutter, and landscaped areas."  If this occurred, Miller was required to remove the damaged portion, obtain proper compaction and replace that area.  Snyder's interpretation argues that "damaged area" would constitute the entire parking lot, even if only a small area settled.  The Court finds this construction is unreasonable and ignores the clear meaning of the phrase "damaged area."  The common sense interpretation of this phrase is that if only a portion of the parking area was damaged due to settlement, Miller had to remove that area and replace it.  It simply defies reason to believe that Snyder and Miller intended to require total replacement of the parking lot even if only a small area settled.  Reading the flow-through clause in this way would negate the language of Paragraph 2(I)(28) of the Subcontract.   There would be no need for a requirement that Miller repair damaged areas if Miller's contractual obligation was completely a matter of HAOT's discretion.  Snyder's reading would subject a subcontractor to the possibility of repair costs that could easily dwarf the value of the

---

[8]  At several points the Subcontract clearly imposes an obligation from the Prime Contracts.  For example, the Subcontract provides that Miller is "Responsible for all bedding and compaction of trenches per contract documents. . . ."  {Dkt. No. 64, Exh. "A" at ¶ 2(I)(28).  The Subcontract also states:  "All trenches to be compacted to 95% per contract documents."  *Id.*  There is no similar express statement concerning repairs to the utility trenches.

11

subcontract. Such an interpretation would render Paragraph 2(I)(28) meaningless, and, thus, is not an acceptable reading of the contract.

The flow-through clause imposes a duty on subcontractors of compliance with the overall terms of the Prime contract(s). Thus, Miller may have obligations regarding safety regulations, for example, that must conform to HAOT's directives. But where the Subcontract has clearly stated the parties' intentions at the time of contracting, the flow-through clause cannot be read to render those clear intentions a nullity. The Court's reading of the Subcontract gives meaning both to the language of Paragraph 2(I)(28) and the language of the flow through clause, without creating unintended contractual obligations or consequences.[9] Reading the Subcontract as Snyder suggests would render Paragraph 2(I)(28) meaningless because the flow through clause would impose obligations on Miller far beyond the parties' intentions as clearly expressed in Paragraph 2(I)(28). While the Subcontract states that Miller's duties include but are not limited to those set forth in Paragraph 2(I)(28), the Court concludes the clear intention of the parties was that other duties not enumerated might fall upon Miller but that where a duty was clearly expressly in the Subcontract that provision established the parties' intentions and controlled.

---

[9] For example, the prime contract documents make it clear that "The Contract Documents shall not be construed to create a contractual relationship of any kind … between the Owner and a Subcontractor or Sub-subcontractor…." [AIA-A201 ¶1.1.2]

### IV.
### *Summary*

For the reasons set forth above, the Court **DENIES** Snyder's Motion for Summary Judgment [Dkt. No. 63 & 64].  As a result, Miller did not breach the Subcontract by refusing to perform the repair demanded by HAOT and Snyder because the Subcontract did not require Miller to perform this more extensive repair work.  The Court **GRANTS** Miller's Motion for Summary Judgment [Dkt. No. 68] as to the interpretation of the Subcontract and Miller's obligations thereunder.  The Courts finds no ambiguity in the Subcontract and further finds that the repair obligations set forth in Paragraph 2(I)(28) reflects the clear intentions of the parties.  At a hearing conducted Jan. 14, 2010, the parties offered their respective positions as to whether under this interpretation of the Subcontract there remain any further factual issues for determination.  Considering the positions of counsel, the Court concludes that Miller offered to perform work in accordance with its obligations under the Subcontract and thereby fulfilled its contractual obligations.  Accordingly, Judgment for Miller will be entered contemporaneously herewith.  In light of this ruling, Snyder's Motion in Limine [Dkt. No. 72] and Motion to Strike Expert Opinion of Michael J. Berryman [Dkt. No. 73] are **MOOT**.

**IT IS SO ORDERED** this 2nd day of March 2010.

_____
Paul J. Cleary
United States Magistrate Judge